UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ANDREA SAMPSON,                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        No. 4:10 CV 1338 DDN
                                   )
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
            Defendant.             )


**MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Andrea Sampson for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. 401, et seq., and supplemental security income under Title XVI of the Act, 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 8.) For the reasons set forth below, the ALJ's decision is affirmed.


**I. BACKGROUND**

On August 31, 2006, plaintiff Andrea Sampson filed a Title II application for disability insurance benefits and a Title XVI application for supplemental security income, alleging disability beginning November 18, 2005. (Tr. 11.) The claims were denied on December 14, 2006, and plaintiff filed a request for a hearing on January 18, 2007. (Tr. 11.) On May 6, 2008, plaintiff appeared and testified at a hearing in front of the ALJ. (Tr. 11.)

On May 20, 2008, the ALJ issued an unfavorable decision (Tr. 8) On June 18, 2008, plaintiff's request for review of the ALJ's decision was received. (Tr. 24.) On June 15, 2010, the Appeals Council denied plaintiff's request for review. (Tr. 1-5.) Thus, the ALJ's decision became the final decision of the Commissioner.

## II.  MEDICAL HISTORY

In an undated Disability Report (Form SSA-3368), plaintiff wrote that she stopped working her previous job because she did not have a vehicle to get to work.  (Tr. 109.)  Similarly, she stated that in her longest held job as a customer service representative, her main tasks consisted of answering phones; using the computer; filing papers; taking in payments; and other clerical work.  (Tr. 110.)  In that job, she carried files a few feet from the file cabinet to the counter.  (Tr. 111.)  The heaviest weight plaintiff lifted was less than 10 lbs.  (Id.)  In an accompanying Work History Report (Form SSA-3369), she wrote that as a dispatcher, her main duties consisted of speaking with customers and technicians, using the computer, and answering the phone.  (Tr. 118.)  She also noted that this job did not include any physical demands of lifting and carrying.  (Id.)

On May 18, 2005, plaintiff saw Dr. Justin Hugo, complaining of laryngitis and bad muscle cramps in her legs and sides.  (Tr. 174.)  Dr. Hugo noted plaintiff's history of pneumonia, which plaintiff had eight times, and plaintiff's medications, including Glucophage, and high blood pressure medicine.[1]  (Id.)  Dr. Hugo noted plaintiff's weight of 288 pounds and diagnosed plaintiff with hoarseness and a sebaceous cyst.  (Tr. 173.)

On July 1, 2005, Dr. Hugo noted plaintiff had suprapubic pain, right back pain, a cough, chest tightness, wheezing, and nausea.  (Tr. 170.)  Dr. Hugo diagnosed plaintiff as having an upper respiratory infection.  (Id.)

On November 2, 2005, plaintiff complained to Dr. Hugo of weakness, shortness of breath, and congestion, and was diagnosed with unspecified pneumonia.  (Tr. 169.)  St. Anthony's Medical Center's records list the admitting diagnosis as a cough and Dr. Hugo as the attending physician.  (Tr. 180.)

---

[1]Glucophage is used to control high blood sugar in patients with type 2 diabetes (non-insulin-dependent diabetes).  WebMD, http://www.webmd.com/drugs (last visited May 26, 2011).

On November 9, 2005, plaintiff was admitted to St. Anthony's Medical Center for pneumonia. (Tr. 226.) After noting plaintiff was suffering from right chest pain and empyema[2] with increasing shortness of breath, Dr. Peter Fonseca noted that on November 18, 2005, he performed a fiberoptic bronchoscopy, right video assisted thoracic surgical decortications,[3] right video assisted thoracic surgical wedge resection[4] right lower lobe, and inserted a left subclavian triple lumen central venous catheter. (Tr. 233.)

Plaintiff's discharge diagnoses on November 30, 2005 were: methicillin-resistant Staphylococcus aureus pneumonia with complicated parapneumonic effusion, status post decortications, Type II diabetes, hypertension, hypercholesterolemia, proteinuria, status post cholecystectomy, status post left ankle surgery, status post tubal ligation, and status post cervical diskctomy. (Tr. 227) In the discharge papers, Dr. Hugo described plaintiff's condition as "stable" and noted plaintiff's activities upon discharge could be "as tolerated." (Tr. 226.)

On December 7, 2005, an x-ray revealed a slight improvement in both the infiltrates of plaintiff's right lower lobe and moderate right effusion as compared to November 28, 2005. (Tr. 220.) Dr. Fonseca wrote in a letter to Dr. Hugo that the chest x-ray showed adequate re-expansion of the lung with only a minimal right pleural effusion, and prescribed

---

[2]Empyema is the presence of pus in the pleural space which is between the outer surface of the lung and the chest wall. Empyema is often a complication of pneumonia caused by bacteria. MedicineNet, http://www.medterms.com/script (last visited June 28, 2011).

[3]A decortication is the surgical removal of the cortex of an organ, an enveloping membrane, or a constrictive covering. Merriam-Webster, http://merriam-webster.com/medical (last visited June 28, 2011).

[4]A wedge resection is a type of lung cancer surgery in which the tumor and a small amount of surrounding tissue is removed. http://lungcancer.about.com/of/glossary (last visited June 28, 2011).

plaintiff Percocet for the fair amount of pain Dr. Fonseca noted plaintiff was experiencing.[5]  (Tr. 185.)

On December 21, 2005, another x-ray of plaintiff showed the removal of PICC line[6], improved right lower lobe infiltrate, and improved right costophrenic[7] angle blunting.  (Tr. 218.)  Dr. Fonseca noted that while plaintiff was experiencing a fair amount of pain, plaintiff's lungs were clear and her chest x-ray looked "amazingly well."  (Tr. 186.)  Dr. Fonseca gave plaintiff an additional prescription of Percocet and cleared her to return to work without restriction as a dispatcher on December 26, 2005.  (Tr. 186.)

An x-ray taken on January 11, 2006 showed no significant interval change from December 21, 2005.  (Tr. 216.)  Dr. Fonseca noted that the x-ray and physical exam were "completely unremarkable" and that the plaintiff had returned to work full-time.  (Tr. 187.)  Dr. Fonseca noted that the plaintiff was experiencing a fair amount of pain and wrote an additional prescription for Neurontin.[8]  (Id.)

On January 30, 2006, Dr. Fonseca noted that plaintiff had discussed her continued pain and stated that the Neurontin seemed to help, but that she still required Percocet and that the pain was keeping her from sleeping.  (Tr. 188.)  Dr. Fonseca prescribed Ultram and Vicodin.[9]  (Id.)

---

[5]Percocet is used to help relieve moderate to severe pain.  It contains a narcotic pain reliever (oxycodone) and a non-narcotic pain reliever (acetaminophen).  WebMD, http://www.webmd.com/drugs (last visited May 26, 2011).

[6]A PICC line is a central venous catheter inserted into a vein in the arm.  WebMD, http://www.webmd.com/pain-management (last visited June 28, 2011).

[7]Costophrenic refers to the rubs and the diaphragm.  Merriam-Webster, http://www.meriam-webster.com/medical (last visited June 28, 2011).

[8]Neurontin is used to prevent and control seizures, and to relieve nerve pain in adults.  WebMD, http://www.webmd.com/drugs (last visited May 26, 2011).

[9]Ultram is used to help relieve moderate to moderately severe pain. Vicodin is used to relieve moderate to severe pain.  It contains a
(continued...)

On February 17, 2006, Dr. Fonseca examined plaintiff and noted that she had what appeared to be a severe post thoracotomy syndrome and was fairly incapacitated. (Tr. 189.) Dr. Fonseca scheduled plaintiff to seek pain management and prescribed additional Percocet. (Id.)

On February 21, 2006, a chest CT scan was compared to the chest CT of November 17, 2005. (Tr. 212.) The impression offered was a triangular area of pleural thickening with calcification and radiating fibrosis right lower lobe, healing right sixth lateral rib fracture, and minimal scattered areas of pleural thickening in the right chest. (Id.)

On April 28, 2006, plaintiff was admitted to St. Anthony's Medical Center. (Tr. 203.) She was discharged on April 30, 2006 and given a discharge status of "home/self care." (Id.) Her admitting diagnosis was noted as perirectal abscess. (Tr. 204.) Dr. Ralph Silverman noted that plaintiff underwent an operation on April 28, 2006 for drainage of a debridement of a perirectal abscess and did well postoperatively. (Tr. 207.)

On August 17, 2006, plaintiff was admitted to the emergency room for gastroenteritis. (Tr. 237.) A myocardial scintigraphy[10] revealed a small anteroapical fixed defect, no clear-cut reversible defect, and a 61% ejection fraction with apical dyskinesis, possibly artifactual. (Tr. 192-193.) An Adenosine Thallium Stress Test was inconclusive, but negative for angina and ischemia.[11] (Tr. 194.) The Thallium test also

---

[9](...continued)
narcotic pain reliever (hydrocodone) and a non-narcotic pain reliever (acetaminophen). WebMD, http://www.webmd.com/drugs (last visited May 26, 2011).

[10]A myocardial scintigraphy is a diagnostic technique in which a two-dimensional picture of internal body tissue is produced through the detection of radiation emitted by a radioactive substance administered into the middle muscular layer of the heart wall. Merriam-Webster, http://www.merriam-webster.com/medical (last visited June 28, 2011).

[11]An Adenosine Thallium Stress Test is a method of administering a heart test used in people who are unable to exercise. A drug is given to make the heart respond as if the person were exercising. This way the doctor can still determine how the heart responds to stress, but no exercise is required. WebMD, http://www.webmd.com/drugs (last visited (continued...)

noted plaintiff's history of recent , sharp chest pain, with and without exertion, with shortness of breath on exertion; and a history of hypertension, Type II diabetes mellitus, a history of smoking from one and a half to two packs of cigarettes a day, and a strong family history of heart disease. (Id.) Dr. Mehrdad Saeedvafa noted that the Thallium stress test was "unremarkable" and noted that plaintiff could be discharged to home and put on Prilosec. (Tr. 237.)

On December 4, 2006, plaintiff was seen by Dr. Saul Silvermintz. (Tr. 238.) Following a physical examination, Dr. Silvermintz noted: plaintiff's range of motion in both upper limbs was limited because extension led to pain at the base of the neck on the right side; the left ankle had a markedly limited range of motion; the left ankle was thickened and swollen; and plaintiff walked with a limp favoring her left leg. (Tr. 240.) Range of motion testing conducted on December 4, 2006 by Dr. Silvermintz noted: limited flexion of plaintiff's upper limbs; limited abduction of the upper extremities, and dorsi-flexion on the left ankle; limitation in the cervical spine's lateral flexion, and rotation; and limitations on the left ankle in plantar-flexion. (Tr. 244-45.)

Dr. Silvermintz generally noted plaintiff was a well-developed, obese female who was not in any acute distress or discomfort on that day, spoke well, and heard normal conversational tones. (Tr. 239.) Dr. Silvermintz's clinical impressions were: uncontrolled hypertension with no evidence of end organ damage; diabetes mellitus type II with no evidence of end organ damage; status post fracture left ankle with residual pain and limitation of motion; chronic lumbar strain; irritable bowel syndrome; status post decortication of part of the right lung secondary to empyema; and morbid obesity. (Tr. 241.)

Progress notes from therapist Sara Riney dated February 6, 2007 to April 6, 2007 indicate that plaintiff reported: going shopping with her sister; being employed a dispatcher for about a year, but being dismissed due to lack of transportation; having an Associate's degree in

_____

[11](...continued)
May 26, 2011).

Communications; and looking for a job but having difficulty finding one due to a felony conviction. (Tr. 262-272.)

Plaintiff was seen by Dr. Khawla Khan on February 9, 2007 complaining of panic attacks. (Tr. 160.) Dr. Khan diagnosed panic attacks with agoraphobia and major depression, recurrent, and assigned plaintiff a Global Assessment of Functioning (GAF) score of 50.[12] (Tr. 261.) Dr. Khan noted that plaintiff had been put on probation for five years sometime after 2002 after a car mechanic was found to have been making methamphetamine in plaintiff's garage, which plaintiff claimed was without her knowledge. (Tr. 261.) Dr. Khan prescribed Celexa and Klonopin.[13] (Tr. 261.)

On March 2, 2007, Dr. Khan saw plaintiff for a follow-up medication management appointment. (Tr. 259.) Dr. Khan noted that plaintiff said she noticed a 50% improvement in her depression and anxiety. (Tr. 259.) Dr. Khan signed an Individual Treatment and Rehabilitation Plan noting diagnosis of panic disorder with agoraphobia, major depression, recurrent, and an assessed GAF of 50. (Tr. 268.) Dr. Khan increased the dosage of Celexa. (Tr. 259.)

On May 2, 2007, plaintiff was seen by Dr. Jaron Asher and complained of anxiety. (Tr. 256.) She was diagnosed as having major depression, recurrent, panic disorder. (Id.) Dr. Asher noted the plaintiff reported that it takes considerable effort for her to go into a store and she was staying in the comfort zones of her home and her car. (Id.) Dr. Asher

---

[12]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score from 41 to 50 represents serious symptoms or any serious impairment in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders, 32-34.

[13]Celexa is an antidepressant used to treat depression by restoring the balance of neurotransmitters such as serotonin in the brain. Klonopin is used to prevent and control seizures and to treat panic attacks. WebMD, http://www.webmd.com/drugs (last visited May 26, 2011).

assessed plaintiff's GAF at 55 and noted plaintiff was seeing a therapist, Rachel Pourchot.[14] (Id.)

On March 6, 2007, plaintiff was seen at Southwest Medical Center and was diagnosed as having diabetes mellitus and gastroesophageal reflex disease. (Tr. 286.)

On May 8, 2007, Dr. Brian Bergfeld completed a Diabetes Mellitus Residual Functional Capacity Questionnaire regarding plaintiff. (Tr. 277.) Dr. Bergfeld noted that plaintiff had diabetes, hypertension, increased cholesterol, gastroesophageal reflux disease, irritable bowel syndrome, depression, agoraphobia, and panic attacks. (Tr. 273.) Plaintiff's symptoms included fatigue, difficulty walking, bladder infections, swelling, psychological problems, leg cramping, extremity pain and numbness, diarrhea, frequency of urination, and sweating; however, Dr. Bergfeld noted that his clinical findings were nonspecific and that emotional factors contributed to plaintiff's symptoms and functional limitations. (Tr. 273.) Dr. Bergfeld noted that plaintiff was incapable of even "low stress" jobs, but also that plaintiff's experience of pain or other symptoms was never severe enough to interfere with the attention and concentration needed to perform even simple work tasks. (Tr. 274.) Dr. Bergfeld further noted that plaintiff was likely to be absent from work more than four days a month as a result of the impairment or treatment. (Tr. 276.) Dr. Bergfeld opined that plaintiff would need to take unscheduled breaks every thirty minutes during an 8-hour working day. (Tr. 275.) Dr. Bergfeld noted that plaintiff could frequently lift less than 10 pounds, but could never twist, stoop, crouch/squat, climb ladders, or because of her fear, climb stairs. (Id.) Grasping, turning, twisting of objects, and fine manipulations were listed by Dr. Bergfeld at 100%, but reaching overhead was rated at 0% because of reported neck pain. (Tr. 276.)

On May 9, 2007, Dr. Asher completed a Mental Residual Functional Capacity Questionnaire regarding plaintiff. (Tr. 283.) Dr. Asher assigned plaintiff a GAF score of 55 and indicated a diagnosis of panic

---

[14]On the GAF scale, a score from 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders, 32-34.

disorder with agoraphobia, major depression, recurrent, and noted plaintiff had Axis IV psychosocial and environmental problems with employment, finances, and probation. (Tr. 278.) When identifying plaintiff's signs and symptoms, Dr. Asher noted: generalized present anxiety; persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation; apprehensive expectation; and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week. (Tr. 279.)

Dr. Asher noted plaintiff was limited but satisfactory in remembering work-like procedures; carrying out very short and simple instructions; maintaining attention for two hour segment; carrying detailed instructions; and making simple work-related decisions. (Tr. 280-281.) Plaintiff was seriously limited but not precluded from: interacting appropriately with the general public; maintaining regular attendance and being punctual; sustaining an ordinary routine; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; and dealing with normal work stress. (Id.) Plaintiff was noted as unable to meet competitive standards for working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods. (Tr. 280.) Additionally, Dr. Asher noted plaintiff was likely to be absent from work more than four days per month and that the impairment lasted or could be expected to last at least twelve months. (Tr. 282.)

On May 15, 2007, plaintiff saw Dr. Bergfeld at Southwest Medical Center for lower back pain and was given stretching exercises, along with Ibuprofen and Flexeril.[15] (Tr. 284.)

---

[15]Flexeril is used to relax muscles and treat muscle pain and spasms associated with strains, sprains, and other muscle injuries. WebMD, http://www.webmd.com/drugs (last visited May 26, 2011).

Progress notes from case manager Rachel Pourchot dating from May 15, 2007 to May 7, 2008 indicate that plaintiff: reported minimal anxiety when shopping and going into public areas; reported having a panic attack while in a Wal-Mart; experiencing crying spells; suffering from high levels of depression; having family difficulties; walking with a cane; arrived at the appointments well dressed and groomed; often had to reschedule appointments; reported being convicted of a felony; ended a five-year relationship with her boyfriend; and reported that her car broke down and that she had no money for repairs. (Tr. 302-14, 320-39, 453-55.)

On July 5, 2007, plaintiff was again seen by Dr. Bergfeld, who noted that plaintiff reported limping for five years. (Tr. 297.) Dr. Bergfeld offered the impressions of hypertension, diabetes, ankle pain, and a urinary tract infection. (Id.)

On July 18, 2007, plaintiff was seen by Dr. M. Asif Qaisrani and was diagnosed as having major depressive disorder, panic disorder, hypertension, and diabetes, and was assigned a GAF score of 55. (Tr. 300-01.) Noting plaintiff's complaints about the sexual side effects of her current medications, Dr. Qaisrani prescribed plaintiff Wellbutrin.[16] (Id.)

On October 2, 2007, plaintiff received a prescription from Dr. Bergfeld for a 4 point cane and was diagnosed as having hip osteoarthritis. (Tr. 294.)

On October 10, 2007, plaintiff was seen at Southwest Medical Center reporting shortness of breath, fatigue, and laryngitis. (Tr. 295.) She was diagnosed with bronchitis. (Id.)

On November 21, 2007, Dr. Neil Brickel saw plaintiff for a psychiatric followup. (Tr. 318-19.) Dr. Brickel noted diagnoses of major depression, phobic, and some panic disorder, all of which were in remission. (Tr. 319.) Dr. Brickel assigned plaintiff a GAF score of 70

---

[16]Wellbutrin is an antidepressant used to treat depression and other mental/mood disorders. WebMD, http://www.webmd.com/drugs (last visited May 26, 2011).

and told plaintiff to return in a couple of months for a routine followup.[17] (Id.)

Dr. Brickel's records for January 23, 2008 note plaintiff was functioning at a GAF score at 60 to 65. (Tr. 316.) Dr. Brickel also noted plaintiff's diagnoses as major depressive disorder, in fairly good remission, with some environmental issues adding to her depression and anxiety. (Id.)

On March 26, 2008, Dr. Brickel noted plaintiff's diagnosis as major depressive disorder with anxiety under fairly good control, and gave a GAF score of 65. (Tr. 315.) Dr. Brickel switched plaintiff from Klonopin to Xanax.[18] (Tr. 318.)

On April 9, 2008, Dr. Brickel noted a diagnosis of major depressive disorder and opined that plaintiff was functioning at a GAF score of 55. (Tr. 443.) Plaintiff's dosage of Wellbutrin was increased. (Id.) Additionally, Dr. Brickel filled out a Mental Residual Functional Capacity Questionnaire, and noted a current GAF score of 60-65. (Tr. 340.)

On May 7, 2008, Dr. Brickel noted  diagnoses of major depressive disorder and a general anxiety disorder. (Tr. 440.) Dr. Brickel noted no evidence of worsening of plaintiff's depression, and assigned a GAF score of 55. (Tr. 440-41.)

**Records Submitted Directly to the Appeals Council**

Progress notes from case manager Rachel Pourchot dated May 23, 2008 to February 10, 2010 indicate plaintiff reported: having continual transportation problems; obtaining a car; expressing a deep feeling of depression and anxiety; having trouble sleeping; expressing a fear of

---

[17]On the GAF scale, a score of 61-70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. Diagnostic and Statistical Manuel of Mental Disorders, 32-34.

[18]Xanax is used to treat anxiety and panic disorders by enhancing the effects of a natural chemical in the body. WebMD, http://www.webmd.com/drugs (last visited May 26, 2011).

dying young; quitting smoking cigarettes and starting smoking again; having trouble with personal relationships and referring to the men in her life as "Captain Hooks"; entering into new relationships; having a panic attack in a store; and experiencing continual physical pain. (Tr. 382-429, 445-52.)

On May 28, 2008, Dr. Brickel noted that plaintiff was having major financial difficulties and was not in a position to be employed. (Tr. 442.) Dr. Brickel expressed that in his clinical opinion plaintiff would qualify for some type of financial assistance and was not capable of working a part-time or full-time job. (Id.)

On July 9, 2008, Dr. Brickel noted a diagnosis of major depressive disorder with anxiety. (Tr. 380.) Additionally, Dr. Brickel assessed plaintiff's GAF score at 55-60 and stated that plaintiff was not able to work any kind of part-time or full-time work. (Id.)

Dr. Brickel's treatment notes dated September 17, 2008 assessed plaintiff's GAF score at 55 to 60 and listed diagnoses of major depressive disorder and general anxiety disorder in fairly good remission. (Tr. 378.) Plaintiff was prescribed Trazodone.[19] (Id.)

On December 10, 2008, Dr. Brickel noted diagnoses of major depression in good balance and remission, and general anxiety under good control; he assessed plaintiff's GAF score at "a 60 maybe 65." (Tr. 376.)

On March 4, 2009, Dr. Brickel diagnosed plaintiff with major depression and anxiety under good control and assigned plaintiff a GAF score from 60 to 65. (Tr. 374.)

Two reports from Dr. Brickel dated June 3, 2009 diagnosed plaintiff with a major depressive disorder in good remission; he assigned plaintiff GAF scores of 60 and 65. (Tr. 371-373.)

Dr. Brickel's treatment notes for August 26, 2009 note a diagnosis of major depressive disorder, in fairly good remission and functional improvement. (Tr. 369.) Dr. Brickel further noted that plaintiff's stressors continued to be financial and assessed plaintiff's GAF at 60.

_____

[19]Trazodone is used to treat depression by helping to restore the balance of serotonin in the brain. WebMD, http://www.webmd.com/drugs (last visited May 26, 2011).

(Id.) Dr. Brickel discontinued plaintiff's prescriptions for Celexa and Wellbutrin, and instead gave plaintiff a prescription for Cymbalta.[20] (Id.)

On November 18, 2009, Dr. Brickel assessed plaintiff's GAF at 60 to 65 and noted diagnoses of major depressive disorder in fair remission and anxiety in good remission though with medication. (Tr. 367.)

On February 10, 2010, Dr. Brickel noted plaintiff reported difficulty sleeping. (Tr. 365.) Dr. Brickel stated that plaintiff's mental status exam is unchanged from her last evaluation in November. (Id.) Dr. Brickel assessed plaintiff's GAF at 60 to 65. (Tr. 366.)

On February 24, 2010, Dr. Brickel completed a Mental Residual Functional Capacity Questionnaire. (Tr. 431-36.) Dr. Brickel assessed plaintiff's current GAF score at 60 and noted plaintiff's highest GAF for the past year was 55 to 60. (Tr. 431.) Dr. Brickel noted plaintiff's abilities were unlimited or very good for categories such as: understanding and remembering very short and simple instructions; and maintaining attention for a two hour segment; making simple work-related decisions; and maintaining socially appropriate behavior. (Tr. 433-34.) Dr. Brickel believed plaintiff was unable to meet competitive standards for categories such as: setting realistic goals or making plans independently of others; dealing with the stress of semiskilled and skilled work; dealing with normal work stress; performing at a consistent pace without an unreasonable number and length of rest periods; and remembering work-like procedures. (Id.) Dr. Brickel left blank a question regarding when the earliest date that the description of limitations applied to plaintiff. (Tr. 436.)

**Testimony at the Hearing**

On May 6, 2008, plaintiff appeared and testified to the following at a hearing before the ALJ. (Tr. 25-43.) She was born on October 1, 1952 and was then 55 years old. (Tr. 28.) At the time of the hearing, she was 5'6" and weighed 208 pounds, but in November 2005 she weighed 268

---

[20]Cymbalta is used to treat depression and other mental disorders. WebMD, http://www.webmd.com/drugs (last visited May 26, 2011).

pounds.  (Id.)  She testified that she has an A.A.S. degree in Communications with a concentration in English. (Tr. 29.) Her job ended because she had no transportation due to her lung surgery. (Tr. 30.) She is able to drive but doesn't have a vehicle. (Tr. 39.) The reason her last job ended was because after her lung surgery, it was difficult for her to perform her duties. (Tr. 42.)  She gets panic attacks about three to four times a week when around too many people, which causes her to get light headed and short of breath. (Tr. 30-31.) Depression causes her to cry throughout the day unpredictably. (Tr. 31.)

She walks with a cane because ankle pain limits her balance. (Tr. 34-35.)  She is unable to stand for more than five minutes at a time because of ankle pain and arthritis in her hip. (Tr. 36.)  She had a lung removed in November 2005 which causes her difficulty breathing. (Tr. 36.)  Her breathing is also affected by allergies, walking, cold temperatures, and humidity; smoking, or being around someone who is smoking, does not affect her breathing   (Tr. 37-38.)  She is not insulin-dependent, and her diabetes mainly affects her diet. (Tr. 38.) She performs household activities such as cooking, doing laundry, making the bed, vacuuming, and doing the dishes. (Tr. 40.)  When doing the dishes, she often has to sit down because she cannot stand for very long or breathe. (Tr. 40.)  She goes to the grocery store once a week. (Tr. 41.)  She can work at a computer, but has difficulty concentrating. (Tr. 42.)  She experiences problems sleeping, mainly when she feels depressed. (Tr. 41.)  She is currently on probation for a controlled substance offense, but has never had a problem with illegal drugs or alcohol. (Tr. 41-42.)

### III.  DECISION OF THE ALJ

On May 20, 2008, the ALJ determined that plaintiff was not disabled. (Tr. 13.)  At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity since November 18, 2005. (Tr. 13.) At Step Two, the ALJ found plaintiff had the following severe combination of impairments: obesity, status-post right lung wedge resection, status-post left foot fracture, mild osteopenia, major depression and panic

disorder.[21]  (Tr. 13.)  At Step Three, the ALJ found that plaintiff did not have an impairment of combination of impairments that met or medically equaled one of the listed impairments.  The ALJ then determined that plaintiff has the residual functional capacity (RFC) to perform the full range of sedentary work.[22]  (Tr. 16.)  At Step Four, the ALJ concluded that plaintiff's RFC did not preclude her from performing her past relevant work (PRW) as a dispatcher and customer service representative. (Tr. 19.) Consequently, the ALJ found plaintiff was not disabled as defined under the Act.  (Tr. 20.)  He therefore did not proceed to Step Five.

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because

---

[21]Osteopenia refers to bone mineral density that is lower than normal peak bone mineral density but not low enough to be classified as osteoporosis.  Having osteopenia means there is a greater risk that, as time passes, the patient may develop bone mineral density (osteoporosis). WebMD, http://www.webmd.com/drugs (last visited May 26, 2011).

[22]20 C.F.R. § 404.1567(a) defines sedentary work as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  The sitting requirement for a full range of sedentary work allows for "normal breaks at two hour intervals."  Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005).  Additionally, a claimant must be able to walk or stand for approximately two hours out of an eight-hour day.  Id.

substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Kroqmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work. Id. The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that plaintiff retained the RFC to perform her PRW as a dispatcher and as a customer service representative.

**V. DISCUSSION**

Plaintiff argues the ALJ erred in: (1) failing to properly consider and point to medical evidence in reaching his RFC determination, and (2) failing to include a function-by-function analysis in his RFC determination.

## A. RFC Determination

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence. Plaintiff argues that the ALJ did not accord proper weight to the medical opinions of Drs. Bergfeld, Asher, and Brickel when determining claimant's RFC.

### 1. Plaintiff's Credibility

The ALJ "must determine a claimant's RFC based upon all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). Ultimately, though, RFC is a medical determination. Singh v. Apfel, 222 F.3d 448, 459 (8th Cir. 2000). Before determining a claimant's RFC, the ALJ must first "evaluate the claimant's credibility." Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). If there are inconsistencies in the evidence as a whole, a claimant's subjective complaints may be discounted. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In evaluating a claimant's RFC, an ALJ may consider: the claimant's daily activities; the duration, frequency and intensity of pain; functional restrictions; precipitating and aggravating factors; and the dosage, effectiveness and side effects of medication. Id.; see also 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ's decision to discredit plaintiff's subjective complaints was sufficiently detailed and is supported by substantial evidence. The ALJ noted that, while plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms (Tr. 18), several inconsistencies between her subjective complaints of pain and her daily living patterns diminished her credibility. (Tr. 19.) Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990)(extent of daily living activities can be considered when evaluating a claimant's credibility).

The ALJ noted that the plaintiff's testimony indicated that she is able to perform household activities such as cooking, doing laundry, making the bed, vacuuming, and doing the dishes. (Tr. 18, 19, 40.) Plaintiff is able to go to the grocery store once a week. (Tr. 41.) She reported: getting along well with others; having no trouble paying

attention; being able to finish projects; having the ability to handle changes in a routine without difficulty; and, being able to follow instructions. (Tr. 19, 138-40, 304.) Consequently, the ALJ found that these inconsistences between her daily activities and her subjective complaints do not lend credibility to her argument that she ought to be precluded from all types of work. (Tr. 19.)

Therefore, the ALJ did not err in finding plaintiff's testimony not entirely credible.

### 2. Treating Physicians' Opinions

A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). The ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must always give good reasons for the weight afforded to the treating source's opinion. 20 C.F.R. § 404.1527(d)(2).

### i. Opinion of Dr. Bergfeld

Plaintiff argues that the ALJ erred by giving Dr. Bergfeld's May 8, 2007 report little weight. The ALJ determined that Dr. Bergfeld's report was internally inconsistent and was based on plaintiff's own subjective complaints of her limitations instead of objective diagnostic medical evidence. (Tr. 18.)

The ALJ may discount treating physician's opinion based on the claimant's subjective complaints of pain. Teague v. Astrue, 638 F.3d 611, 615-616 (8th Cir. 2011). In his report, Dr. Bergfeld noted that plaintiff's pain was never severe enough to interfere with the attention and concentration needed to perform even simple work tasks. (Tr. 15, 275.) The ALJ noted that this finding was inconsistent with Dr. Bergfeld's finding that plaintiff was incapable of even low stress work and could be expected on average to be absent form work due to her impairments more that four days per month. (Tr. 15, 274-275.) The ALJ

may discount or disregard an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000).

Therefore, the ALJ's decision to afford Dr. Bergfeld's May 8, 2007 report is supported by substantial evidence.

### ii. Opinion of Dr. Asher

Plaintiff also challenges the weight given by the ALJ to Dr. Asher's opinions. In a May 9, 2007 report, Dr. Asher assigned plaintiff a GAF score of 55 and noted plaintiff had severe mental limitations which could be expected to last at least twelve months, and that plaintiff would likely be absent from work more than four days per month. (Tr. 18, 282.) But, Dr. Brickel later assigned plaintiff GAF scores of 60-65 in April of 2008 and 70 in November of 2007. (Tr. 18, 319, 340.) Prosch, 201 F.3d at 1013 (inconsistent opinions).

In his decision to give Dr. Asher's opinion little weight, the ALJ also noted that on May 9, 2007, Dr. Asher had just commenced care. (Tr. 18, 278.) The length of the treating period may be considered by the ALJ in evaluating whether to give a treating source controlling weight. Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004); see also 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

Therefore, the ALJ's decision to consider the findings of Dr. Asher's May 2007 report as "short-term and not of twelve months in duration" is supported by substantial evidence. (Tr. 18.)

### iii. Opinion of Dr. Brickel

Plaintiff further argues that the ALJ erred by failing to consider the opinion of Dr. Brickel. The record indicated, however, that the ALJ did review the opinions of Dr. Brickel in arriving at his conclusion that plaintiff had the RFC to perform a full range of sedentary work.

The ALJ noted that the April 2008 opinion of Dr. Brickel was

submitted in the record. (Tr. 18, 340-345.) The ALJ assigned that report "little to no weight" because Dr. Brickel's GAF assessment was contrary to his findings, in that an individual cannot be so limited as described in Dr. Brickel's report and have a GAF score of 60-65. (Tr. 18.) Prosch, 201 F.3d at 1013 (inconsistent opinion). Thus, the ALJ properly considered and discounted Dr. Brickel's opinion.

Therefore, based on the record as a whole, the ALJ's determination that plaintiff had the ability to perform a full range of sedentary work is supported by substantial evidence.

### iv. Re-contacting of Physicians

Plaintiff further argues that the ALJ failed to fully and fairly develop the record because the ALJ should have re-contacted the examining or treating physicians to clarify their findings.

The ALJ's duty to contact a treating physician for clarification is triggered when "a crucial issue is undeveloped." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). The ALJ is required to re-contact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim. Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004); see also 20 C.F.R. §§ 416.912(e), 416.919(a)(b). An ALJ is not required to re-contact a treating physician "whose opinion was inherently contradictory or unreliable." Hacker, 459 F.3d at 938.

Having discredited the opinions of Dr. Bergfeld, Dr. Asher, and Dr. Brickel for being internally inconsistent with the record as a whole, the ALJ was under no obligation to re-contact them. Therefore, it was not an error for the ALJ to fail to re-contact them.

## B. ALJ's Analysis at Step Four

### 1. PRW Determination

Plaintiff argues that the ALJ erred in failing to provide a function-by-function analysis of the demands of her PRW as a dispatcher and customer service representative supported by the testimony of a VE.

At Step Four, "[t]he ALJ must... make explicit findings regarding the actual physical and mental demands of the claimant's past work."

Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999). This information is to be derived from "a detailed description of the work obtained from the claimant, employer, or other informed source."[23] Groeper v. Sullivan, 932 F.2d 1234, 1238 (8th Cir. 1991); see also Samons v. Astrue, 497 F.3d 813, 821 (8th Cir. 2007) (ALJ can rely on the claimant's description of her PRW in making this determination).

Plaintiff testified that as a customer service representative her daily work functions were composed of: answering phones; using the computer; filing papers; taking in payments; and other clerical work. (Tr. 110.) The physical demands of this job required plaintiff to occasionally carry files a few feet from the file cabinet to the counter. (Tr. 111.) Plaintiff never lifted more than 10 pounds. (Tr. 111.) As a dispatcher plaintiff's duties consisted of speaking with customers and technicians, using the computer, and answering the phone. (Tr. 118.) Plaintiff testified that this job did not include any lifting and carrying. (Tr. 118.)

Therefore, plaintiff's testimony was sufficiently detailed to permit the ALJ to determine the demands of her PRW.

## 2. Function-by-Function Analysis

Plaintiff argues that ALJ also erred in determining her ability to perform her PRW. Specifically, plaintiff argues that the ALJ erred in failing to go through a function-by-function analysis of plaintiff's PRW.

After determining the demands of the claimant's relevant PRW, the ALJ must determine whether the claimant's RFC allows the claimant to meet the demands of her PRW. Groeper, 932 F.2d at 1239; see also Kirby v. Sullivan, 923 F.2d 1323, 1328 (8th Cir. 1991) ("A comparison of the claimant's residual functional capacity with the actual functional demands of her particular past employment is essential to a determination that she is capable of performing her past relevant work.").

A mere conclusory statement that a claimant can perform her past

_____

[23]"Such other informed sources include the Dictionary of Occupational Titles that are associated with the claimant's past work," Pfitzner, 169 F.3d at 569, and the testimony of a vocational expert. Wagner v. Astrue, 499 F.3d 842, 854 (8th Cir. 2007).

work is not sufficient to indicate that substantial evidence supports the decision.  <u>Pfitzner</u>, 169 F.3d at 568.  Rather, "[t]he ALJ must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's residual functional capacity."  <u>Id</u>.

The ALJ concluded plaintiff has the RFC to perform the full range of sedentary work.  (Tr. 16.)  The ALJ then applied plaintiff's RFC to perform sedentary work with the functional demands of her PRW.  (Tr. 20.)  The ALJ noted that as a dispatcher plaintiff reported doing no stooping, knelling, bending, crouching, crawling, handling, reaching, or writing.  (Tr. 20.)  Plaintiff was seated while answering the telephone and using the computer.  (Tr. 20.)  As a customer service representative, plaintiff reported that she sat most of the day and that her exertional requirements were the same as for the dispatcher job.  (Tr. 20.)

Thus, the ALJ properly considered plaintiff's RFC in concluding that she could return to her PRW.  The decision of the ALJ is supported by substantial evidence.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.

_____/S/    David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 5, 2011.